Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Dec 19 2013, 9:52 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RHETT D. GONTERMAN**
Ziemer, Stayman, Weitzel, & Shoulders, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**TERRY G. FARMER**
**DANIEL R. ROBINSON, JR.**
Bamberger, Foreman, Oswald & Hahn, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| T. KYLE BUEHNER, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 82A01-1302-CC-00061 |
| | ) | |
| EVANSVILLE TEACHERS FEDERAL | ) | |
| CREDIT UNION, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable David D. Kiely, Judge
Cause No. 82D03-1104-CC-1946

**December 19, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Timothy Kyle Buehner ("Kyle") appeals the Vanderburgh Superior Court's judgment in favor of the Evansville Teachers Federal Credit Union ("the Credit Union") finding that the Credit Union had authority to seize funds in Kyle's savings account to satisfy his father's debt. The dispositive issue presented in this appeal is whether Kyle's father was a joint owner of the savings account.

We affirm.

### Facts and Procedural History

Kyle was born in December 1980 to Mary T. Buehner ("Mother") and Timothy K. Buehner ("Father"). In 1981, Mother was a member of the Credit Union, which is a federally chartered credit union. On July 2, 1981, Mother executed a written account agreement ("the 1981 Agreement") to open a savings account for Kyle ("the Savings Account"). The application for membership in the Credit Union was signed by Mother as "Timothy Kyle Buehner by mother." Appellant's App. p. 36. Deposits into this account were made by Mother on Kyle's behalf or by Kyle himself. Father never withdrew or deposited funds into the Savings Account.

In March 1998, when Kyle was seventeen-years-old, Kyle, Mother, and Father executed an updated Application for Membership as well as a Joint Share Account Agreement for the Savings Account ("the 1998 Agreement"). Kyle, Mother, and Father signed the 1998 Agreement, and listed their social security numbers and dates of birth. The agreement provides in pertinent part:

2

The Evansville Teachers Federal Credit Union is hereby authorized to recognize any of the signatures subscribed below in the payment of funds or the transaction of any business for this account. The joint owners of this account hereby agree with each other and with said credit union that all sums now paid in on shares, or heretofore or hereafter paid in on shares by any or all of said joint owners to their credit as such joint owners with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship and be subject to the withdrawal or receipt of any of them, and payment to any of them or the survivor or survivors shall be valid and discharge said credit union from any liability for such payment. The joint owners also agree to the terms and conditions of the account as established by the credit union from time to time.

Any or all of said joint owners may pledge all or any part of the shares in this account as collateral security to a loan or loans from the credit union, if said joint owner is a member of the Credit Union.

Appellant's App. p. 38.

On June 2, 1999, after Kyle's eighteenth birthday and prior to the start of his freshman year of college, Kyle, Mother, and Father executed an additional Agreement and Application with the Credit Union to open a joint checking account ("the Joint Checking Account"). The Joint Checking Account agreement did not include any collateral pledge terms.

On November 29, 2007, Father executed and delivered a promissory note to the Credit Union, with a maturity date of December 15, 2008. The original principal amount was $50,000. The promissory note was also governed by a business loan agreement executed by Father and the Credit Union. That agreement provided that "all loan advances under this [promissory note] are secured by all shares and deposits in all joint and individual accounts Borrower has with Lender now and in the future. Borrower authorizes Lender . . . to apply the balance in these accounts to pay any amounts due" in the event of Borrower's default. Ex. Vol., Stipulated Joint Ex. U. On July 2, 2010, the

3

promissory note was in default and the Credit Union transferred $46,523.34 from the Savings Account to pay the balance owed on Father's note.

On April 27, 2011, Kyle filed a complaint against the Credit Union alleging breach of contract, breach of trust, fraud and conversion. Kyle claimed that the Credit Union illegally seized his funds to satisfy Father's debt to the Credit Union. A bench trial was held on December 10, 2012, and the trial court issued Findings of Fact and Conclusions of Law shortly thereafter. The trial court entered judgment in favor of the Credit Union after concluding that the Credit Union "was within its rights to debit [the Savings Account] and apply the proceeds toward the outstanding loan balance upon the maturity of the Note." Appellant's App. p. 18. Kyle now appeals. Additional facts will be provided as necessary.

**Standard of Review**

The trial court issued findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). Under such circumstances, our standard of review is well-settled:

> First, we must determine whether the evidence supports the trial court's findings of fact. Second, we must determine whether those findings of fact support the trial court's conclusions of law. We will set aside the findings only if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.
> In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. To make a determination that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made.

4

Hartley v. Hartley, 862 N.E.2d 274, 281 (Ind. Ct. App. 2007) (quoting Gregg v. Cooper, 812 N.E.2d 210, 214–15 (Ind. Ct. App. 2004), trans. denied).

**Discussion and Decision**

The dispositive issue presented in this appeal is whether Father was a joint owner of the Savings Account. Kyle argues that the Savings Account was a custodial savings account and he is the sole owner of the Savings Account; therefore, the Credit Union's seizure of his funds to satisfy Father's debt was unauthorized and illegal.

In finding number three, the trial court found that Mother solely executed a written account agreement on July 2, 1981, "as custodian for Kyle and opened a savings account for Kyle[.]" Appellant's App. p. 13. Therefore, the trial court implicitly found that Father was not a joint owner of the Savings Account when it was opened in 1981.

We also observe that contrary to Kyle's claim, the Savings Account was not a custodial account as that term is used in the Uniform Transfer to Minors Act, which was enacted in 1989 to replace the Uniform Gifts to Minors Act. See Tr. p. 122; Ind. Code § 30-2-8.5-24 (providing that "[c]ustodial property is created and a transfer is made if . . . money is paid or delivered to a broker or financial institution for credit to an account in the name of [] the transferor . . . followed by the words: 'as custodian for [name of minor] under the Indiana uniform transfers to minors act'") (formerly Ind. Code § 30-2-8-1 et seq.). On the application for membership, Mother simply signed, "Timothy Kyle Buehner by mother." Appellant's App. p. 36. Mother did not designate herself as Kyle's custodian.

5

Also, the 1981 Agreement expressly states that the account is a "joint" account. See id. at 37. The agreement also expressly provides that the "joint owners of this account, hereby agree with each other and with said Credit Union that all sums now paid in on shares, or heretofore or hereafter paid in on shares by any or all of said joint owners to their credit as such joint owners with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship . . . ."[1] Id.

The trial court entered the following additional findings concerning ownership of the Savings Account:

> 4. On March 10, 1998, [Kyle, Mother and Father] executed an updated Application for Membership as well as an updated Joint Share Account Agreement . . . for the purpose of updating each of the parties' signatures on record.
> 5. The signing of the application and account agreement in 1998 ratified in all respects each of the parties' membership in [the Credit Union], as well as each parties' joint ownership of the [Savings Account].
> ***
> 8. On June 2, 1999, [Kyle, Mother, and Father] executed an additional Agreement and Application with [the Credit Union] relating to a Checking Agreement with Overdraft Transfer from Regular Shares and/or Loan Account agreement with [the Credit Union} . . . .
> 9. The signing of the application and checking agreement in 1999 further ratified each of the parties' membership in [the Credit Union], as well as each parties' joint ownership of the [Savings Account] and the [Checking Account].

Appellant's App. pp. 14-15. The Savings and Checking Accounts exist under the same member number and the "Overdraft Transfer from Regular Shares and/or Loan Account"

---

[1] In light of this evidence, we conclude that the trial court's use of the term "custodian" in finding number 3 was not used as a term of art, but simply as a reference to the relationship between Kyle and Mother.

[2] The account statements were specifically addressed to T. Kyle Buehner on the first line and "Mary or

agreement signed by Kyle, Mother, and Father lists the account number for the Savings and Checking Accounts.

Kyle argues that the trial court's finding that Mother opened the Savings Account "as custodian for Kyle" is "inconsistent with the conclusion that the" 1999 Agreement ratified "each parties' joint ownership of the" Savings Account. Appellant's Br. at 10. Kyle contends that "ratification does not create something new; it only confirms what previously existed." Id. at 11. Therefore, because Father was not a joint owner of the Savings Account when it was created in 1981, Kyle argues that the theory of ratification cannot be applied to later add Father as a joint owner of the account.

"A principal will be bound by a contract entered into by the principal's agent on his behalf regardless of the agent's lack of authority if the principal subsequently ratifies the contract as one to which he is bound." Guideone Ins. Co. v. U.S. Water Sys. Inc., 950 N.E.2d 1236, 1242 (Ind. Ct. App. 2011). Ratification may be express, where the principal explicitly approves the contract, or implied, where the principal does not object to the contract and accepts the contract's benefits. Id. More specifically,

> [r]atification means the adoption of that which was done for and in the name of another without authority. It is in the nature of a cure for [lack of] authorization. When ratification takes place, the act stands as an authorized one, and makes the whole act, transaction, or contract good from the beginning. Ratification is a question of fact, and ordinarily may be inferred from the conduct of the parties. The acts, words, silence, dealings, and knowledge of the principal, as well as many other facts and circumstances, may be shown as evidence tending to warrant the inference or finding of the ultimate fact of ratification. . . . Knowledge, like other facts, need not be proved by any particular kind or class of evidence, and may be inferred from facts and circumstances.

Id. (quotation and citation omitted). Importantly, "[k]nowledge of all the material facts by the person to be charged with the unauthorized acts of another is an indispensable element of ratification." Id. We further observe that "'[r]atification applies when a party to a contract, with knowledge of facts entitling that party to rescind the contract, treats the contract as a continuing and valid obligation, thus leading the other party to believe that the contract is still in effect.'" Smith v. McLeod Distributing, Inc., 744 N.E.2d 459 (Ind. Ct. App. 2000) (quoting Winkler v. V.G. Reed & Sons, Inc., 638 N.E.2d 1228, 1236 n. 6 (Ind. 1994)).

The trial court properly found that the Savings Account was a joint account when Mother executed a written account agreement with the Credit Union to open a Savings Account for Kyle in 1981. See Tr. p. 69; Ex. Vol. Credit Union Ex. C. The 1981 membership application for the Savings Account lists Kyle, Mother, and Father's initial. Father signed the Joint Share Account Agreement but his signature is crossed out. Father's birthdate and social security number were not listed on the agreement.

In March 1998, when Kyle was seventeen-years-old, Kyle, Mother, and Father executed an updated Application for Membership as well as a Joint Share Account Agreement for the Savings Account, the 1998 Agreement. The Credit Union requested that the parties sign a new agreement because the Credit Union was updating its records and changing computer systems. Tr. p. 68.

Kyle, Mother, and Father all signed the 1998 Agreement and listed their social security numbers and dates of birth. The 1981 Agreement and 1998 Agreement are nearly identical. The 1998 Agreement provides:

8

The Evansville Teachers Federal Credit Union is hereby authorized to recognize any of the signatures subscribed below in the payment of funds or the transaction of any business for this account. The joint owners of this account hereby agree with each other and with said credit union that all sums now paid in on shares, or heretofore or hereafter paid in on shares by any or all of said joint owners to their credit as such joint owners with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship and be subject to the withdrawal or receipt of any of them, and payment to any of them or the survivor or survivors shall be valid and discharge said credit union from any liability for such payment. The joint owners also agree to the terms and conditions of the account as established by the credit union from time to time.

Any or all of said joint owners may pledge all or any part of the shares in this account as collateral security to a loan or loans from the credit union, if said joint owner is a member of the Credit Union.

Appellant's App. p. 38. Also, until 2003, the Savings Account statements were sent to Kyle, Mother and Father.[2]

In 1999, after Kyle's eighteenth birthday, Kyle, Mother, and Father executed an additional Agreement and Application with the Credit Union to open a joint checking account. The Savings Account and Joint Checking Account are listed under the same account or "member" number. See e.g. Appellee's App. p. 25.

Kyle continued to maintain the Savings Account as a joint account after his eighteenth birthday, consistent with his implicit understanding pursuant to 1998 Agreement that the Savings Account was a joint account. See Tr. p. 86. After he turned eighteen, Kyle continued to actively use the Savings Account and Joint Checking Account. See e.g. tr. p. 92.

---

[2] The account statements were specifically addressed to T. Kyle Buehner on the first line and "Mary or Tim Buehner" on the second line of the address section of the statement. See e.g. Ex. Vol., Credit Union Ex. B.

9

Under these facts and circumstances, we conclude that while the Credit Union may have initially included Father as a joint owner of the Savings Account, by mistake, Kyle ratified or acquiesced in the Credit Union's addition of Father as a joint owner of the Savings Account by failing to address that error. Father's name appears on nearly every document associated with the Savings Account including the account statements up to 2003. Also, Kyle does not dispute that after his eighteenth birthday he opened a joint checking account with Mother and Father, which account was listed under the same member number as the Savings Account. Kyle could have, but failed to, take any action to remove either of his parents as a joint owner of the account or close the account after his eighteenth birthday in 1999.

We therefore conclude that the trial court properly found that Kyle, Mother, and Father were joint owners of the Savings Account. In his Appellant's Brief, Kyle concedes that our conclusion in this regard means that the Credit Union had the authority to seize the funds in the Savings Account to satisfy Father's debt. See Appellant's Br. at 9. For all of these reasons then, we affirm the trial court's judgment in favor of the Credit Union.

Affirmed.

NAJAM, J., and BROWN, J., concur.